CABELE, J.
I concur in the opinion that the paper in question is sufficiently proved to have been wholly written byThomas Sharp. But I cannot agree that he intended it to be his will.
A paper is not to be established as a man’s will, merely by proving, that he intended to make a disposition of his property similar to, or even identically the same with, that contained in the paper. It must satisfactorily appear, that he intended the very paper to be his will. Unless it appear, that the very paper was intended to be his will, it must be rejected; however correct it may be in its form, however comprehensive in its details, however conformable to the otherwise declared intentions of the pa rty, and although it may have been signed by him with all due solemnity. In the case of Matthews v. Warner, the paper offered as a will, began thus: 1 ‘2 Nov. 1785. A plan of a will proposed to be drawn out at the last testament of William Matthews, storekeeper of his. majesty’s yard at Deptford.” After the usual preludes, being in health, sound in mind &c. it proceeded; “Imprimis. I give unto Miss Isabella Johnson, &c. ” and then proceeded with several other specific legacies; and after disposing of the residue of his estate, concluded thus: “I appoint my good friend Mr. Edw. L’Epine and my good friend Mr. Edw. Johnson, my executors, to see this my last will and testament complied with. Dated *at Deptford, 2d Oct. 1785;” and was signed “Wm. Matthews.” There then followed a codicil; “I must not forget my good friends Miss Mary and Miss Charlotte Howell, who desire will accept of five guineas each, for rings to wear in remembrance of me. 6 Oct. 1785. Wm. Matthews.” It was indorsed, “A plan designed for the last will and testament of Wm. Matthews, storekeeper of his majesty’s yard, Deptford.” Lord Eldon held this not to be a will, because it appeared, as he conceived, from the expressions in the beginning of the paper, and in the indorsement upon it, “A plan &c.” that Matthews did not intend that paper to be his will, but onljT the plan, according to which, a will was to be afterwards drawn out. And I understand it to be now definitively settled in England, that even where a paper purports to be a will, and is signed in such manner as would be sufficient to give it effect as a will, yet if it appears on the face of the paper, that something more was intended to be done, and the party was not arrested by sickness or death, it shall not be a will. Roberts on Wills, ch. 1, part 17, p. 198-202. Roberts, in summing up the law upon the subject, says, ‘ ‘The later determinations at Doctor’s commons, seem tending to establish a more discriminative doctrine,” than that which formerly prevailed. “It.now appears tobe agreed, that if a testator leaves an instrument, which upon the face of it, carries evidence of an intention in the framer to perfect it by some *325 further solemnity, which he died without having superadded, having had afterwards ■sufficient time and health and recollection to complete it, such paper may be inferred not to have been intended to operate as it ■stood; and the omission to finish may ground a presumption of a change of mind in the deceased.” After reciting some -cases in confirmation of this principle, he says, “The same doctrine is recognized by lord Eldon, in the late case of Coles v. Tricothick, 9 Ves. 249, who thus expresses -himself on this point. ‘The observation is just, that as to personal estate, if it appear upon the will, that something more was intended to be done, and the *party was not arrested by sickness or death, that is not held a signing of the will.’ It seems therefore to be now understood that not every scrap of paper which a man ■writes in contemplation of death, making ■mention of intended dispositions of his personal property, will be received in the ecclesiastical courts as testamentary.”
Ret us apply these principles to the paper before us. The whole of the first side of it, (judging from the colour of the ink, the stroke of the pen, and the character of the handwriting) was written at the same tame, except the words “my extors.” &c. and perhaps the date, and some fee alterations. This side of the paper constitutes the body of the will, if will it may be called. But what is it? It bears on its face, intrinsic and (to my mind) irresistible evidence, that this paper was not, when it was written, intended to be his will. It is not, in the beginning, end, or any other part of it, recognized or spoken of by the writer, as a will, or even as the memorandum for a will. There is not a word in it, from which it can even be inferred to be a memorandum for a will, except the part where mention is made of funeral charges, a tombstone, and executors. There is not from the beginning to the end, one word commonly used in giving or disposing of property, by deed or will. Did ever man, however ignorant, sit down to write a will, and finish the work in this form, and upon such a mutilated piece of paper! And it is evident, that Sharp, although of secluded habits, is no where represented as an ignorant man. On the contrary, he is said to have done all his own writing, and to have kept his accounts very accurately. It is clear to my mind that this paper was, on its face, no more than a mere memorandum of the manner in which he intended to give his property, by a will thereafter to be made.
This result, deduced from the intrinsic evidence of the paper itself, is fortified by the positive testimony of witnesses. [Here the judge recapitulated the testimony of three of the witnesses, which, he said, left no doubt with him, that Sharp did not consider or intend this paper to be his will.]
*'That part of the paper, relating to his wife, dated February 12, 182S, does not mend the matter. There are no words of disposition there, giving the lands to his wife; there is no recognition of the paper as his will. It is itself, a mere memorandum, and cannot change the character of what had been previously written on the other side, which was also nothing more than a memorandum. It was no will and not intended to be so when it was written.
I do not deny, that this paper, originally written as a mere memorandum for a will, might have become his will, provided he had afterwards published it as such. But this he never did.
It is said, however, that he afterwards considered it as his will. I do not believe that that, even if it were clearly proved, would make it his will. But there is no satisfactory proof, that he ever afterwards considered or wished this paper to be his will. The evidence, on this point, is very contradictory, and preponderates, in my opinion, against the proposition: at any rate, the declarations ascribed to him by the several witnesses, are so contradictory in themselves, and so inconsistent with the provisions of the paper now brought forward as his will, that they can give it no support whatever; even if a paper purporting, on its face, not to be a will, but a mere memorandum for a will, could, in any case, become a will, by general declarations of the testator, that he had made a will containing dispositions similar to those indicated in the memorandum. But I do not think, that such a paper ever could become a will, without proof of a subsequent publication thereof as such. The evidence of such publication, is not to be found in this record.
If Sharp intended this paper to be his will, it is very strange that, conversing with so many persons, and with such un-reservedness, on the intended disposition of his property, he should never have shewn it to any of them; particularly, when we recollect, that the most, if not all of these conversations, took place at his own house, where the paper was kept. It is passing strange, even if he intended to make *the very disposition of his property, indicated by this writing, that he should have been satisfied to make it on such a small, torn, defaced, mutilated fragment of paper. If it had been written when he was in extremis, and in a situation where a more suitable piece of paper could not be had, this remark would be entitled to no consideration: but this writing was commenced at least nine years before his death, and was revised by him about one year before his death. Under these circumstances, I repeat, that it is passing strange, if he intended it, on the 12th Feb. 1825, to be his will, that he did not, at some period between that and his death, transfer it to a different paper. A man who wrote with the facility with which he appears to have done, might have copied it, at any time, in less than ten minutes.
But, it is said, this paper was preserved with care, and was found, after his death, in the place where it was reasonable to expect he would deposit his will. I answer, that, if it were intended as a mere memorandum for a will, to be afterwards made, it would have been preserved with care, and would have been found, probably, in the same place.
No man could be more disposed than I *326 am, to construe, with liberality, the wills which men have actually made. But wills must be made, before they can be construed. Every man, having1 property, must feel an interest that his property should pass, after his death, to the persons whom he would wish to have it. If he fails to make a will, having time and opportunity to do so, it must be presumed that he wishes those to have it, whom the law may designate as his heirs or distributees. I fear this reasonable intent would be 'frequently disappointed, if we decide, that “such a thing as this” (I use lord Eldon’s language in a like case) is to be established as a will. I think the sentence of the circuit court ought to be affirmed.
BROOKE, P., concurred in this opinion.
But by a majority of the court, the sentence was reversed &c.